Case number 221-1195 et al. Ferriless Energy, LLC, petitioner for the Federal Energy Regulatory Commission. Mr. Buchholz for the petitioner. Ms. Bensa for the respondent. Mr. Bonnet for the intervener. Good morning, your honors. May it please the court, Jeffrey Buchholz for petitioner of Ferriless Energy. Your honors, I'd like to make two points about the two related errors that FERC made in the decision below here. We had a state law contract claim governed by Texas law that the parties, our predecessor, Dominion and Transco, agreed on the rate that would apply under this contract and that they agreed that the zone six to zone six rate would apply. FERC made two errors. First, FERC erred grabbing that Texas law contract issue from the Texas court and deciding to exercise primary jurisdiction. And second, FERC compounded that error by then refusing to actually adjudicate our Texas law claim instead of assuming it away. So first, I want to make sure that I'm clear about what our claim is, because FERC has persistently refused or been unable to understand what our claim is. Our claim is that notwithstanding Exhibit C saying that there's not a quote unquote negotiated rate, that the parties nonetheless, our predecessor Dominion and Transco, had a rate would apply. And FERC has just never, has never acknowledged that that's our claim. They've never acknowledged that's our claim. They've never dealt with that claim. FERC takes the position that you signed a contract with Transco, you had a chance in that contract specifically to state any negotiated rate. And that contract says there is none. And so that's clear. And there's no basis to consider extrinsic evidence. And why isn't that law applicable here? But Your Honor, again, I want to be clear what our claim is. We understand that- I get your claim. And I'm just saying you saw your client signed a contract. And whatever your Texas claim was, as to the contract it signed with Transco, here's what it said. And there's no ambiguity about what it said. So, Your Honor, first of all, Texas law recognizes the concept of latent ambiguity, where the analysis is not as simple as you look at the document in isolation. We understand that Exhibit C says none. We're not arguing that there's- I don't see Texas law to say that when the contract, the four corners of the contract are clear on its face, it is permissible to consider extrinsic evidence is to the party's intent. What's your- Judge Frederick, there's two Texas Supreme Court cases that Coker and J.W. Hampton that say that the contract is not unambiguous, despite what it might look like on its face. But again, the Texas Supreme Court has repeatedly recognized the concept of a latent ambiguity, where you take the document, you apply it to particular facts, and that ambiguity arises. And those two cases, the Texas Supreme Court remanded for the trial court to determine the actual intent of the parties. And- What is your latent ambiguity? Latent ambiguity here, Your Honor, is not whether there's a negotiated rate. We understand that there isn't a negotiated rate. Exhibit C says that there isn't. Our claim is that nonetheless, the parties here, our predecessor, Dominion and Transco, had a meeting of the minds about what rate would apply under the tariff, that that agreement was zone six to zone six rate. But the contract says, this is in day 76, in the article governing rates, it says that the buyer shall pay the seller in accordance with the seller's tariff that's been filed with FERC, as that tariff may be amended from time to time, et cetera. So the contract here, I want to be clear with this, does not say that the parties agreed that the market link incremental rate will apply. If that's what the contract said, then it would be fair to say we'd be trying to change the terms of the contract, but that's not what it says. The contract doesn't specify which rate under the tariff applies. Our position is the parties, in their negotiations, had a meeting of the minds about which rate under the tariff, there's 30 something rates under the tariff. And our position is the parties had a meeting of the minds that the rate that applied was zone six to zone six rate. Why is that not a negotiated rate when the contract that your client was taking over, as you point out, always had these different rates specified. And now in the contract, the new contract that your client signs with Transco, it says there is none. And it doesn't deny that it's receiving service over this extension where Transco has always charged this additional higher rate in the absence of a negotiated rate. I mean, why would your client say none? That's what's inexplicable. I don't know why that's latent. So your honor, first, I want to make clear that it wasn't our client, our client, whoever was representing Fairless at the time, or if it was proceeding pro se. I didn't mean into this. No, I'm sorry, your honor. That's not what I meant. This is an important point. Fairless is not the original party to this contract. Fairless's predecessor, Dominion, was negotiated with Transco. Your honor, I'm trying to answer your question about why parties to the 2018 contract wrote what they wrote. And part of my answer to that is I don't know because my client wasn't one of the parties. My client came in later and inherited this contract from Dominion. And so that's why we've said throughout in the Texas court and in all the HERC proceedings that we need discovery and an evidentiary hearing, including to take evidence from Dominion, which has that firsthand evidence that we don't have for no fault of our own, about what occurred during those negotiations. Our position is we're not claiming to approve this yet. We haven't had the opportunity to prove it yet. Our position is that evidence will show that Dominion and Transco agreed that the zone six to zone six rate would apply it. To answer your honor's question about why they nonetheless said there's no negotiated rate in light of the history of these contracts, some of the prior contracts, your honor, didn't just choose one of the many rates available under the tariff. They negotiated a different rate, a rate that transportation, 210, pooling plant to fareless facility, agreed on a rate of 16 cents. Now that rate didn't appear in the tariff. That wasn't choosing one tariff rate versus a different tariff rate. That was negotiating an entirely new rate. That rate, of course, had to be set forth on exhibit C as a negotiated rate because otherwise the rate didn't exist, wasn't in the tariff. But here our position is parties agreed that one of the tariff rates, zone six to zone six rate, which FERC has already decided is just and reasonable, would apply. That rate, by the way, is consistent with our predecessor, Dominion, and Transco's course of dealing under these contracts going back many years, many iterations. And what's not consistent with that, and what doesn't make any sense under the circumstances of this contract, is saying that all of a sudden the contract rate doubled to the market link incremental rate, which is about 25 cents from the 12 cent rate that applied for part of the time period, or the dramatic increase that we represented from 16 cents at 25 cent rate. The parties never agreed to pay anything like 25 cents for this part of the pipeline. There are other parts of the pipeline, other parts of transportation at issue under other contracts where the parties agreed that the incremental market link rate would apply because those parts of the contract call for transportation over more of the market link stretch so that it is fair to pay more of the market link rate. But here, it's really anomalous. And again, we just don't have the first-hand knowledge because we weren't the party for the 2018 negotiations. It's really anomalous to think that Dominion agreed to double the rate from 12 to 25 cents, or 13 to 25 cents. And even if you think of it as going up from 16 to 25, that's still a huge increase in the rate for absolutely no change. The same quantity of gas, same stretch of pipeline, all the same terms, nothing changed. Why would the rate double? It doesn't make sense. So that's why we think that if there were an evidentiary hearing and we had an opportunity for discovery, that we would be able to prove our claim that there is meeting of the minds by the parties on this rate. But we're not asking this court to hold that we're right about that. All we're asking for is a chance to be heard somewhere. We think that should have been in Texas State Court. All of her precedents support the idea that if it's a state law contract claim, and the claim is that there was a meeting of the minds between the parties under perhaps idiosyncratic negotiation conditions, that FERC has no interest in that. FERC has no expertise in that. That's an issue that FERC should leave to the Texas State Court. Endeavor- Was this agreement filed with FERC? The 2018? Yes. Yes. All the FERC jurisdictional contracts get filed with FERC. That's right, Your Honor. But what I was wanting to say is all of FERC's precedents, and again, this is an APA review case, so FERC has to be affirmed, if at all, based on the reasons that it gave under Chenery. FERC's precedents, like Endeavor, and BG, and Northern Natural, and Farmland, and many others that we cite in our briefs, there's a whole line of them, say in general that FERC doesn't have any particular expertise in state law contract claims, doesn't have any particular need to resolve those issues. In BG, FERC made that, in Farmland, FERC made the good point that it actually can definitively resolve those issues. If they're issues of state law, the state Supreme Court can definitively resolve them, not FERC. But why does it make sense for FERC to devote its resources to grabbing these issues out of the state courts, where the state courts are perfectly competent to decide them? And Endeavor- I'm sorry, Your Honor, go ahead. Has FERC generally dealt with these contract issues once these agreements are filed with them? I'm sorry, Your Honor, I didn't hear your question. Has FERC generally dealt with these contract issues once these agreements are filed with them? I think the most analogous case to try to answer that question is Endeavor. In Endeavor, the parties had a state law contract dispute, and then behind that, depending on the outcome of the state law contract dispute, there would have been a tariff interpretation question that might or might not have arisen, depending on the outcome of the state law contract claim. So the party that- so one party brought a state law case in state court. The other party went to FERC and said, you should grab this case under primary jurisdiction because there's a tariff interpretation question. FERC said, well, there may or may not be. There may or may not be a tariff interpretation question. It depends on what happens with the threshold state law question. So I'll just read the relevant line of paragraph 13 of Endeavor. FERC says, this argument only may become relevant after the contract has been interpreted. This issue will not become ripe until the ongoing state court proceeding is completed and may never become ripe at all. At this stage, no need exists for the commission to exercise jurisdiction. That was just as true here. Here we had a state law contract claim. We might succeed. We might not in state court. If we succeeded, then by definition, there was a contractual agreement on a rate, no issue about how to interpret the tariff whenever it arrives. If we lost in state court, then that means that whatever the rate is under the tariff applies. Yes, FERC has an interest in that question, but that question wasn't presented yet and it might never be depending on the outcome of our state court case. FERC didn't grapple with Endeavor because I think the reason is, just as this court said in Dynagy, it's not clear that FERC ever understood what our claim was. FERC persistently said that we didn't have a contract claim, that this is really just a dispute about how the tariff would be interpreted. That just assumes our claim away. And I think FERC's brief encapsulates this, the beginning of their summary of arguments, and this is a fair summary of what FERC did below, is this rate dispute is a matter of tariff, not contract interpretation. On its face, the fareless contract undisputedly does not specify a negotiated rate. Therefore, therefore, I'll come back to that, all parties agree that the rate for service under the contract is a reinforced rate established in the tariff. Well, no, we don't agree. We don't agree that just because there's no negotiated rate on exhibit C, that that means that there can't be a contractual agreement on a rate. FERC is assuming that claim away. Therefore, in that quote that I just read, it just doesn't follow. FERC is pretending that our claim is something other than it is, and isn't grappling with the reality of our claim, just like in Dianagy. So it can't be sustainable under the APA for FERC to first exercise primary jurisdiction on the premise that there isn't really a state law contract claim here at all, and there is. And then to compound that error, they're refusing to actually adjudicate it. If the one thing that FERC could exercise primary jurisdiction, and we think that would be wrong, then if FERC could put itself in the shoes of the Texas court and said, okay, we're going to apply Texas law. We're going to put ourselves in the shoes of the Texas court. We're going to do what the Texas court would do. We're going to convene an evidence-free hearing. We're going to allow discovery, and we're going to decide this as if we're a Texas court. But FERC didn't do that. FERC assumed the claim away. And I want to point out what FERC said in its order here, and just show how far it comes from sustaining what FERC did. We're really just talking about three paragraphs in FERC's free hearing order 22, 23, and 24, where FERC gives its rationale. So in paragraph 22, FERC says that to determine whether to examine extrinsic evidence, you consider if the contract unambiguously addresses the issue. That's true as far as it goes, but it ignores the concept of the latent ambiguity. And what's notable is that when FERC said that in paragraph 22, it didn't say anything about Texas law, didn't cite anything to do with under any state's law. Instead, it cited three cases having nothing to do with that situation at all. One was this court's decision in Transmission Agency of Northern California. What happened there was the California system operator asked FERC to approve consolidating two districts into one for pricing authority. FERC approved that, and so it challenged FERC's decision. Nothing to do with state law. Nothing to do with private contracts. This court applied Chevron, not state law, in reviewing that decision by FERC. That has nothing to do with this case. And then FERC cited Southwest Powerful, its own decision, where FERC interpreted not just a contract within its four corners, but a long history of FERC proceedings, settlements, tariffs, to determine whether there was a carve-out under a settlement that FERC had previously approved. There's no issue with state law, not a private contract case. And because the tariff was ambiguous, I mean, notably in that case, FERC looked not just to the four corners of the tariff, but it looked to the whole history of carve-out treatment in that matter. And in paragraph 20, FERC's rehearing order in Southwest Powerful, which, again, FERC cites here in paragraph 22, FERC recognizes the concept of a latent ambiguity, as a latent ambiguity often arises even when language is unambiguous on its face. Well, exactly. But FERC refused to do that here, and it perversely cited that very principle as a purported justification for not giving us a chance to be heard, not giving us a chance to flesh out our claim under Texas law. And then the third and last authority that FERC cited here for its decision to this court's decision in Missouri affirming FERC's decision in Southwest Powerful, where the argument there made to this court was that FERC erred by considering extrinsic evidence, that FERC should have justified interpretive canon to the four corners and not looked beyond it. And this court no, this court said no, FERC was right to look at extrinsic evidence. Again, how that supports FERC's treatment of our Texas law claim here is completely beyond me. And then paragraph 24, the last paragraph of FERC's hearing order shows what FERC really thought, what FERC really was saying. FERC says there, I'm quoting, if the party's intended to apply a tariff rate that diverged from the applicable recourse rate under the tariff, then that understanding would need to have been expressly reflected in the fairless contract as a negotiated rate, unquote. That's a J-84 report. There's no cite for that proposition whatsoever. FERC cites nothing for it, nothing under Texas law, nothing under federal law, nothing. And what FERC is saying there in paragraph 24 is, it's either on Exhibit C or it can't exist. That's not right as a matter of Texas law, where the parties could have a meeting of the minds on a rate, but they didn't call it a negotiated rate and didn't put it on Exhibit C, they could still have a meeting of the minds as a matter of contract. And there's no federal law that would bar Texas from adopting that sort of a contractual principle. I don't know, maybe FERC could convene a rulemaking proceeding and say, we're going to adopt a new rule prospectively that either it's on Exhibit C or it doesn't exist. I don't know if that would be valid or not. I don't know if FERC could do that, but I do know that FERC can't just announce this principle in paragraph 24, citing nothing, making it up, comes from nowhere, has no basis in anything, and have that be a decision for refusing to grapple with the reality of the claim that we brought. So what is your best citation for the proposition that negotiated rate means only one of the alternative rates mentioned in Transco's tariff? Your Honor, I don't have a cite for that proposition and FERC doesn't have a cite in its order for any contrary proposition. I know, but this is FERC interpretation, having decided that the basic issue here is not state contract law, but rather what the tariff provides. And a premise of your argument, I thought, was that since Fairless was not choosing one of the listed alternative rates in the tariff, it necessarily had to answer the question, none. All right? But I didn't see you arguing that, and maybe I missed it, that, in fact, FERC has already recognized this concept of latent ambiguity, and it decided there was none here, and that's the era of law. In other words, I'm trying to understand here, your client takes over somebody else's contract. It knows what the deal was with that other party. Now it's signing its own contract with a new agreement with Transco, filed with FERC. Your Honor, may I stop you there? Because that's an important point, and it's not factually accurate. Our client did not sign a 2018 contract that sets that issue here. That was Dominion signing that contract. I understand that. I understand that. And that's critical here. All right? I understand that. But I'm trying to get you to acknowledge what Fairless did vis-a-vis Transco's tariff. Well, so, Your Honor, let me try to answer your question in a couple different ways. Fairless itself didn't do anything vis-a-vis Transco in terms of the tariff. Fairless bought this contract from Dominion. But I also wanted to respond to what Your Honor said a minute ago about latent ambiguity and what FERC said in— No, I need you to address my next point. I don't— my premise of my question is not that Fairless didn't buy the contract from Dominion. But then—and this is what you need to address—did not Fairless agree to this tariff? That was filed with the Commission, where it stated that there was no alternative rate. That's what I'm trying to understand. So, I'm not sure what Your Honor is referring to in referring to Fairless agreeing to a rate filed in the tariff. I mean, I suppose Fairless could have— No. Come on. You heard my question. I asked you whether the tariff language was referring only to a rate that was not one of the alternative rates mentioned in the—the tariff itself, but rather was something that the parties had previously negotiated, and it wanted to apply—to continue to apply as to the tariff that was being filed, showing it had taken over Dominion's contract. Your Honor, let me try to answer your question. I really am trying. There's a lot of—a lot of things going on in your question. So, first— I'm trying to make it simple, because I understand your responses, but I think you're sliding over this one point I'm trying to understand, and maybe I am misunderstanding the point, but I need to be clear about it. So, I think I heard Your Honor say a moment ago that what we're arguing is that Fairless is arguing that the parties here in the 2018 contracted issue agreed on a rate that isn't in the tariff. That's not—if I heard that correctly, that's not correct. In a prior contract—and this is what I was addressing a few moments ago in response to a different question by Your Honor—in a prior contract, not an issue directly here, the parties Dominion and Transco agreed on a specific rate of $0.16. That rate was set forth on Exhibit C as a negotiated rate because it had to be. $0.16 wasn't the tariff rate. It wasn't one or another of the rates set out in the tariff. It was a separately negotiated rate that, as such, had to be set out in Exhibit C or else it just didn't exist. That's not what is at issue here. Our claim here is not that there is a negotiated rate that isn't in the tariff that the parties agreed on. That's not our claim. Our claim is there are a lot of different rates in the tariff. Parties can agree on one or another of those tariff rates. They're all just and reasonable. They've all been approved by PERC, and here our claim is the parties agreed on the $0.06 to $0.06 tariff rate as opposed to some other tariff rate. But why wouldn't that have been indicated? That's what I'm trying to understand where the contracts—when the tariff was filed, why wouldn't that have been indicated? Well, Your Honor, obviously this would be clearer, and we would be better off if Dominion had, on Exhibit C, noted what our position is. But again, our position under Texas law—I mean, I can't answer exactly what happened in 2018 because we weren't—our client wasn't involved in those discussions. Our client came in later. So the implication is that Transco acted sua sponte without Feralis' knowledge? Well, Transco didn't act sua sponte in agreeing to this contract in 2018 with Dominion, but again, Feralis wasn't— Your Honor, where's Feralis? I guess I'm not sure what Your Honor means by acting sua sponte. I mean, when Feralis— A file of agreement and a tariff that was filed with FERC that said Feralis was now stepping in to Dominion's shoes, basically. Your Honor, I don't know anything one way or the other about that. I don't know how to answer Your Honor's question. I don't know actually what occurred. I am assuming— As a matter of law, did Transco have the authority? Is that part of your response? No, I don't think it is. I mean, my understanding is that the pipeline which has the tariff on file with FERC would need to file with FERC contracts so that those contracts are available with FERC. I assume that Transco did that. I don't know one way or the other as a matter of fact what, if any, involvement Feralis had in that. So that's what I'm saying. I just don't know how to answer that question, Your Honor. I don't know the facts. But I think here— But you only come under the latent ambiguity doctrine. But what's latent about this is what I'm trying to understand. What's latent is how the language in the contract applies to the unique circumstances of these where— Oh, with whom? Between Dominion and Transco. Those were the parties that negotiated. So now we're talking about Feralis and Transco. And the tariff filed there. I don't think anyone disputes that if we're right that Dominion and Transco agree that the zone 6 to zone 6 rate would apply, that Feralis gets the benefit of that agreement. Feralis inherited this contract. So I think the question, again, is just what did Dominion and Feralis agree to as a matter of contract? Did they agree on a contractual rate? Or did they just punt and say whatever rate applies under the tariff is what applies? Counsel, what I'm getting at, and you probably know more about this than I do, if I'm out in the private market and I buy out your interest in an operation, I'm not clear that I would automatically get the benefit of any negotiated rate that you may have obtained. I'm buying your interest. And so I have to indicate clearly what I'm going to do in this new situation. That's the way I understand FERC to argue. And maybe FERC can clarify for me. But that's what I'm having difficulty understanding, where FERC says this is primarily a matter of a tariff interpretation, not state contract. Law. And so it says, look at the four corners of the tariff, end of discussion. And you say, no, no, no, that's wrong. Because I don't know what you'd call it, but there was some kind of agreement with Transco and Feralis that it too would have a negotiated rate. Your Honor, we're not arguing that Feralis itself, as opposed to by operation of law inheriting a contract from Dominion. We're not arguing that Feralis itself negotiated an agreement on a rate with Transco. We're arguing that Dominion did and that Feralis inherited that contract that's in Dominion's shoes and gets whatever the rate is under that contract. And what I tried to do with my hypothetical was I buy your interest in a corporation. There's a proposition of law that I'm not hearing here that if I buy your interest, suppose you own 51% of the shares in a building. Am I, as a matter of law, entitled to any special arrangements that you've made? Or do I have to negotiate my own contract with the other shareholders or the owner of the company? That's all I'm trying to understand here. Right. I understand. And I guess maybe the simplest answer is that's just not what happened here. This isn't about acquiring a majority interest in a corporation and maybe the assets and liabilities go to different places. That's not what happened here. This is just a contract that Dominion had, that Dominion sold to Feralis. And that as a matter of FERC law, I think Your Honor asked a few minutes ago what FERC's position is, and I don't want to speak for FERC, but certainly there's no suggestion in any of the FERC decisions below that Feralis doesn't stand in Dominion's position. Let me take out the double negatives there. As far as I know, everyone here agrees that if Dominion and Transco agree that the six-to-six rate would apply, which is our position, that's what happened, that we, Feralis, get the benefit of that because it's the same contract. We just inherited it. I don't think there's any dispute about that. The dispute is who decides, right? Does the Texas court get to decide whether we're right that there was such a contractual agreement, or does FERC get to decide? And if FERC gets to decide, did FERC actually decide? Did FERC actually grapple with the claim that we brought and decide it, putting itself in the shoes of the Texas court, applying Texas law? Our position is no. If you look at what FERC actually said, FERC didn't cite any Texas law, didn't say anything about Texas law. And in fact, it cited only the three cases I mentioned before, which have nothing to do with private contracts or state law at all. And in fact, in one of those cases, it actually exemplifies how FERC recognizes that it does sometimes have to look beyond the four corners of a document because of latent ambiguity, which is what FERC should have done here, but refused to do, because FERC maybe never understood the reality of the claim that we were bringing, just as in Dynegy. And as a matter of basic APA principles, the court can't sustain an agency's decision if the agency didn't understand the claim that it was adjudicating. The agency misunderstood what was before it, and it can't have issued a decision that was non-arbitrary and capricious or an abuse of discretion. The basic principle of APA review is the agency has to actually understand and grapple with the arguments that are made. There's hundreds of cases by this court that I could cite without proposition. A few of them are in our brief. Dynegy may be the most on point because it involves FERC. And just as here, there the court said, it's not fair that FERC ever really understood what the petitioner was arguing. Here, if FERC did understand that we had a state law claim that there was an agreement on a rate, notwithstanding the fact that it's not a negotiated rate on exhibit C. If FERC did understand that, then FERC improperly swept that under the rug and it never really grappled with that issue, which is why I think FERC actually just didn't understand that. Why this case, at the very least, needs to be remanded to FERC for FERC to grapple with when it didn't grapple with adequately the first time around. What we really think should happen is this case should go back to the Texas state court, just as in Denver, just as in D.J., just as in ARCLA itself, where FERC set out factors governing primary jurisdiction, where FERC says, in general, on state law issues, we don't have any particular expertise. We don't have any particular dog in the fight about state law issues. As long as the rate under state law, one way or the other, whichever rate it is, it's going to be just and reasonable, which both of these are. And it's really not FERC's concern. And it's an idiosyncratic part here. Essentially, this really genuinely generates an issue about what these parties in 2018 agreed to. That really isn't any concern of FERC's, as long as what they agreed to is otherwise just reasonable, which no one here disputes that it is. Right. Thank you. Thank you, counsel. And thank you, Judge Charles, for letting me try to clarify this. Thank you very much. Good morning. Harold Bantz with the Commission. And Judge Rogers, I will address some of the confusion and some of the questions that you were asking. But I have to begin by correcting something. It is entirely incorrect to say that all of the tariff rates would be just and reasonable as to parallel. Because these are tariff recourse rates, meaning that it's what's there if there is no negotiated rate. And we will explain why this is, in fact, a tariff interpretation. Recourse rates are not something that parties agree to. You can state it as a negotiated rate, as these same parties explicitly did in 2006 and 2014 in what we call the 2014 other contract. They actually did agree to give the equivalent of the Zone 6 system rate. And they stated it as a negotiated rate in Exhibit C, where it says a negotiated rate that is the equivalent of Zone 6. Setting aside a negotiated rate stated in Exhibit C, a tariff recourse rate is a specific rate that the Commission has approved as just and reasonable for a particular service. It is a cost-based rate. It's based on cost of service plus a particular profit margin. So there are 32 incremental rates for various expansions on a transgressive system in its tariff. And there's the general system rate. And it is true that the Commission has approved every one of those rates as a just and reasonable cost-based rate. But it's only just and reasonable as to the service, the cost of which is considered when it is approved. So, for instance, the general system rate is made up of the cost of the whole system, upgrades, and it's the mainline system that may be quite old. Parts of it may have been upgraded. Since the 1999 Certificate Policy Statement that we cited, the Commission said, with regard to expansions, for purposes of correct price signaling and also avoiding subsidization and surprise rate changes for existing customers in the mainline system, we will insist that the orders that we cited for this particular expansion that was approved in 1999 and then amended in 2000, in the amending order in 2000, that's when Virginia Marketing first comes into the picture. They're a precedent shipper on this new to-be-built expansion. They dominated Phase 2 of the expansion. They had 100,000 decatherms per day of the 130 on that part. So Transco was building this expansion, and it was justifying the need to build the expansion to the Commission based on the fact that it had these two customers, one of which was Virginia Marketing. And the Commission said, that's fine. Those are your precedent shippers. Your recourse rates have to be based on the cost of that expansion, and those recourse rates will be allocated to the customers of that expansion and not on everyone else. Transco is free, although not obligated, to negotiate rates with its shippers. A pipeline often finds it in its interest to do it. It's trying to attract new shippers to an expansion that it wants to build. So maybe it does negotiate a rate that's lower than the cost-based rate that it can justify to the Commission. But the cost-based rate is there in the tariff as what's there when there's no negotiated rate or when a negotiated rate expires, which is what happened in the 2014 predecessor agreement. There was a negotiated rate that expired in November 2018. And then in December 2018, there's the Fairless contract that says none. So from the expiration on November 1st, it was back to the recourse rate because there was no negotiated rate at that date. And then there was no negotiated rate in the new contract either. But the expansion rate was based on the costs of building and operating the market-length expansion. And that recourse rate is what the Commission found just and reasonable to be the rate for those expansion customers. It has never, and it explicitly said this in footnote 92 in the declaratory order, it has never found that it's just and reasonable for market-length shippers to pay the general system rate. So no, we do not agree that all rates are just and reasonable as to every party. The tariff is not a choose-your-own-recourse-rate menu. If you cannot reach an agreement with pipelines, the recourse rate you pay is the specific rate for the service that you have. And that's the analysis that the Commission did in these orders, what service do you have? And it started with that history of when Virginia Marketing committed the capacity, the 100,000 decatherms per day capacity, just sort of a plan. The Fairless plan hadn't been built yet. It was coming online in 2004. And as we said in our brief, Fairless has repeatedly acknowledged that transfers existing system could not have served it with the amount of fuel that it needed for its plan. The reason Virginia Marketing signed on for the market-length expansion was because it needed to serve this new plant that it was building and the existing transfer system did not have that capacity available to serve. Let's talk a little bit about the jurisdiction though. I mean, what factors would the Commission use when it's looking to determine whether it's going to do that? I think the Commission's holding to what recourse rates are and what they mean was its key. And when it cited it for uniformity, it said in the recurring order that it could have invoked its primary jurisdiction based entirely solely on the uniformity because it's very important. There are other shippers on the market-length expansions. There are other shippers on the 31 other expansion incremental rates that Transco also has. And there are numerous pipelines around the country that have expansion incremental rates and general system rates as a matter of tariff interpretation. If you have a case where one particular party says, well, I don't like the incremental rate. I think I should get the general system rate even though you've never approved the general system rate for market-length shippers, I think I should have it. If that were to prevail, if that view were to prevail, then what stops all the other expansion shippers both on Transco's and any other pipeline from going to court to say, yeah, we don't like our incremental rates either. We'd really like the general system rate. We think it's lower. And you should just give it to that because we agreed to it even though we didn't state it as a negotiated rate. So the Commission found it important as a matter of what tariffs mean and what we're even doing when we approve these rates as just and reasonable. And when we want to guard against subsidization, if the pipeline can't recover its costs for the expansions from its shippers, I mean, we approved it to enable them to recover its costs and we also stand by not allowing the pipeline to get those costs from the other customers to subsidize the expansion because the expansion customers didn't take them. So what do we rely on as precedent for the primary jurisdiction for that proposition about consistency with U.S. contracts here versus this being what the Fairless would consider a tariff issue as opposed to, not a tariff issue, but a contract issue? Well, you mentioned illuminating, certainly, the key case that the Commission cited. In that one, now, the Commission, after invoking primary jurisdiction, did find there was an ambiguity in that contract and said, period. But the Commission isn't citing that here for ambiguity versus four corners of the contract. It's citing it for the importance of its primary jurisdiction. So we have several cases that we cited. I think Northern Natural Gas, the Commission rejected an argument that the case was about a contract rather than a tariff interpretation and found it was important for a tariff interpretation to invoke primary jurisdiction. The United Illuminating, in particular, is important also because it goes to the expertise, which is another thing the Commission cited. We're not going to argue that the idea of recourse rates is a simple concept. And recourse versus negotiated rates, incremental expansion rates versus general system rates, this is the bread and butter of FERC. It's not necessarily the bread and butter of state courts. So it's very similar in United Illuminating. The Commission was dealing with reliability must-run agreements, ISO reliability charges, the kind of thing that the Commission has approved these charges to begin with. And then also, this is the third prong of the regulatory responsibility. In United Illuminating, the Commission said, because we have approved these reliability charges to be recovered, we have an interest in this to make sure they are in fact recovered. And that goes back to what I was saying about incremental expansion rates, that the Commission, having set out a policy decades ago that expansion shippers should pay for expansion facilities with incremental rates that cover the cost of those facilities, having made that as a policy and said that those will not be subsidized by general system customers, the Commission has an interest in making sure that there is a distinction between which rate you pay and that you don't just get to say outside the context of a specific negotiated rate, of course. You don't just get to say, we want that recourse rate because we like that one better, even though it has nothing to do with facilities we're being served on and we've been expansion shippers all along, but we'd rather have that rate. That is not how recourse rates work and that's by the Commission in its primary jurisdiction. And to this date, I don't think the Petitioner has ever cited a case where a court reviewed or let alone overturned that. We're not saying it's non-reviewable, we never argued that, but the discretion is broad and the bar is high. Which I believe this is beyond a typical contract scheme. It is a sheriff. It is a sheriff. And I'd like to go to the contract to really highlight that. But this contract is a formal agreement that Transco uses, that the Commission has approved for that purpose. So this is not a unique contract that the Commission has never seen. But in this world where there are two kinds of rates that you can pay, and I do want to get case data because it also goes to another point, I want to make sure that I highlight Eberdrola Renewables from this court in 2010, talks a lot about negotiator rates versus recourse rates. It also has a successor to a contract that didn't like the deal that their predecessor made. It did not matter. This court talks a great deal in that about negotiated rates. And it's a very helpful piece for the whole context. But Eberdrola Renewables is 597F3rd. I don't know the... That's good enough. The particular part about the successor is at 1305, but the case was at 1299. And looking at day 76, which is this contract, all those same languages in your contract, I'm looking at Article 5, Section 1. So we have the first sentence that says, buyer shall pay seller in accordance with seller's rate schedule F.P. That means, if you don't say anything else, what's the tariff say? What's the recourse rate? And that's why the commission would look at that as a tariff interpretation. It goes on at the end and says, if the buyer and seller mutually agree to a negotiated rate, provisions governing such negotiated rate and term shall be set forth on Exhibit C. I don't think petitioners ever addressed what the meaning of shall... We understand it to be mandatory. If there's a negotiated rate, you say it on Exhibit C. I don't think I've ever heard this argument that you only have to use Exhibit C if you're picking some rate like 30 cents. But it's proven by what they did themselves in 2006 and the 2014 other contracts were on Exhibit C. They did pick a rate from the tariff. They weren't entitled to that rate as a recourse rate, so they got it as a negotiated rate. And so on day 90, which is the 2014 other contract, the Fairless's other contract, got a negotiated base reservation rate and commodity equal to sellers narrowly applicable zone 6 to zone 6 reservation rate. So they don't get it as a matter of recourse under rates, but if they can agree to it, usually between the parties and stated on Exhibit C, they've shown that they can actually pluck a number from the tariff. But absent that agreement that shall be stated on Exhibit C, and they didn't leave Exhibit C blank, they said none. Absent that, it's a tariff case and not a contract case because you don't just get to decide which recourse rate you like better. So going back to a question Judge Child asked at the very beginning, were FERC to be affirmed here, then is there no recourse for Fairless to prove what's being tossed around here as a latent ambiguity? In the state court, in other words, where FERC refers this question to the state court. The state court, let's just hypothetically say, rules in Fairless's favor that there was a negotiated rate. Then does Fairless have to wait until the term of the current tariff expires or can it renegotiate? It can always try to renegotiate, but it would be bound by its contract. Let me say a couple things about latent ambiguity. I did a work search and I see no mention of it in the rehearing request. Well, it's cited at page 24 in the rehearing. At any rate, a rehearing order. In any event, I just want to be clear as to what your understanding of the law is here. The law is in the world of pipeline rates. The pipeline is authorized to negotiate rates and that would be memorialized in the agreement. This agreement says if you negotiate a rate, you set it forth in this contract. And suppose you didn't. Then you're just stuck with the tariff for the term of the tariff. Yes. Unless FERC would agree to rehearing. I don't know what FERC would agree to a rehearing on. I mean, the recourse rates are- Well, it would say there was this latent ambiguity. We thought we didn't have to fill in Exhibit C the way we needed to. But first of all, I mean- FERC would have discretion as to whether it grants rehearing, but I just want to be sure. So once you're stuck, you're stuck. And then whatever the term of the tariff is, you have to wait until you get a chance to enter into a new agreement with- Yeah, I can't agree with FERC's position of stuck. It is the recourse rate and it always was the recourse rate. And again, I would point to Iberdrola Renewables. I mean, this part said in Iberdrola Renewables that when you enter a contract, you are bound by the terms of that. But I just want to understand, it's different in tariff law than it is in general contract law. The other party may not want to renegotiate, but it doesn't mean it's barred from renegotiating. Well, they can renegotiate the contract. The tariff is not negotiated. The tariff is proposed. The tariff rate is proposed and then justified by the pipeline and the commission determines based on a showing of cost of service. It decides what the recourse rate is as a cost-based rate, not a negotiated rate. But the commission believes that, I mean, on its face, Article V says, if you want to negotiate a rate, fine, it shall be stated in this contract. When it says that a buyer shall pay seller in accordance with seller's rate schedule FT, that means you shall pay in accordance with the tariff. The tariff is a matter of tariff interpretation that the commission gets Chevron deference in interpreting the tariff that it approved. But the tariff is not something that any parties negotiated and submitted. Transco had to come in to the commission when it came in, when it was actually looking for certificate approval to build the pipeline. It has to propose its rates. It had to substantiate those rates. It had to show its cost. The commission had to look at that and say, these cost of service rates are just unreasonable under a National Gas Act section four. I should correct myself. There is one other recourse that Fairless or any other party could have. Any party that believes that a rate under the tariff is unjust and unreasonable or unduly discriminatory or preferential can bring a complaint under National Gas Act section five. There are two ways to change tariffs. The pipeline can propose its own change under section four, subject to finding it's just and reasonable. Any other party or the commission itself could then replace it with a just and reasonable rate. They have the same recourse any other party under a tariff has of challenging that rate pursuant to section five. That has been no part of this case. That has not happened. I thought section five was more limited than would embrace what Fairless is arguing here, but maybe I'm wrong. I might not be able to make the showing, but I'm happy with the recourse rate. If they could make the necessary showing, they're not without that avenue. I don't want to hear about that. But is Fairless's latent ambiguity claim loose strength based on its payment of the market link rate? They're trying to argue that there's a latent ambiguity in what the reference tariff means. I've just never seen anything like it. It's a tariff. It's a tariff rate that the commission approved. It's the recourse rate if you don't have a negotiated rate. There's nothing ambiguous about what the contract says. The contract says the tariff rules. If there is any ambiguity about which price in the tariff applies, that's a straight up question of tariff interpretation that the commission gets reference for. The commission went through it in this order looking at what facilities service. It looked at the history of the fact that this all started with service to Fairless that could not be provided under the existing system. So Virginia Marketing was a market link shipper. Every filing that Transcode has made across the time has continued. It's never had authority to charge a different recourse rate. It has authority to negotiate a different rate, but it doesn't have authority to change that recourse rate itself. It has to make a showing to the commission that no one has ever proposed. So the commission looked at Fairless's admissions. Station 210 is part of the market link expansion. So it is served for market link facilities. It always was served from the market link expansion. And the commission looked at the marketing and it has more than a scintilla of substantial evidence, which is what the commission would need to be affirmed on its finding under the contract. I'd say it's much more than a scintilla, but it certainly needs a substantial evidence standard in the National Gas Act. And so the argument that, well, Dominion's special negotiated rate expired in 2018 and that's a fair list indicating something that's contrary, it was going to be stuck with the rate on these expansion facilities. Which is still being served by, but I mean, it certainly could renegotiate if Transcode were open foot and it did negotiate that contract. What I would say is I'm sorry, I lost that thought. So under the commission's view, the latent ambiguity exception, if I can put it that way, does not apply. Right. I mean, again, the commission didn't see that issue raised, so it didn't address that explicitly, but the commission does understand that the reference in the first in the contract says buyer sell base pay seller in accordance with the tariff, unless you state the negotiated rate in Exhibit C. So Exhibit C on its face says none, Article V on its face says it shall be there if it exists, and it doesn't because it says none. So all Article V says is buyer sell base seller the tariff rate. Okay. So when Transcode filed the tariff with the commission, has Fairless seen it in advance? Well, the tariff, these rates were added in the orders in 2000, or the tariff is publicly available. I think it's online. Fairless could have reviewed it. What I'm trying to get at is at what point does Fairless have a chance to raise this point? And I get your point about, well, they just simply misread the contract. They misunderstood the history of events here, the plain terms of the contract, and what FERC was doing with expansion facilities. I think there are two, maybe two more direct answers to your question about what Fairless could have done or could do. And it goes to the same bifurcation between whether you have a negotiated contract rate or a tariff recourse rate. You either reach an agreement with Transcode, and Transcode's counsel, I don't think they speak to this, but there may be some evidence in the records that Transcode isn't obligated to agree to a negotiated rate. It has for a long time. It could, maybe it could in the future. It certainly has the right to, but it doesn't have to. You can try to renegotiate with Transcode, or if you think you can meet the burden under natural gas section five, you can challenge the tariff rate. So those are your recourses under the contract. Either have a negotiated contract rate, or now that you have it, you're in the tariff world and your recourse, now let me confuse the term recourse, your avenue is natural gas section five. Thank you. Thank you. Good afternoon, Your Honor, and may it please the Court, Matt Bennett for Transcode. I'd like to start with the very last question that was asked about whether or any other rate in the tariff is changed. It has to be filed at FERC before the change takes effect, and it is public notice, and people have the opportunity to intervene, protest, comment, do whatever they will. In addition, whenever Transcode negotiates a rate with an individual customer, Transcode files a rate sheet in its tariff, section 13 of the tariff that specifies that rate sheet. The rate sheets that are issued here, in this case, were filed in 2014 for the contract, and in those rate sheets, they actually specified the rate schedule FT Market Link as the rate that was applicable to this service, but for the negotiated rates that they negotiated at the time. One of those rates in the contract that's issued here, expiring November 2018, the parties did not renegotiate, and when they signed a new agreement, it reflected none, which as Judge a rate that is a negotiated rate is one that has to be specified in Exhibit C in order to be effective, and that's per Article 5 of the contract as Ms. Banza acknowledged. Fairless would have you believe that notwithstanding placing the word none in the contract, that they actually, Fairless and Transcode had agreed to some other unspecified rate, but for some reason, did not put it in the contract, which is actually contrary to the other contract, the other 2018 contract that specified the Zone 6, Zone 6 rate as the applicable negotiated rate for that Trump service. And one other point I'd like to make is, as Ms. Banza alluded to, these negotiated rates are often negotiated at the outset when a pipeline is building an expansion to attract shippers to that expansion. Those rates do tend to be time limited. The initial negotiated rate in this case was time limited to 10 years. Transcode was willing to renegotiate that with the shipper, first Virginia Power Energy Marketing, and later with Dominion Energy Fairless over time, but Transcode has never agreed to a negotiated rate for any of this pipeline expansion service in perpetuity. And I will note that over time as the MarketLink project has been in service, when it was first placed in service, most of the agreements were with negotiated rates. And since over the course of time, that has actually slipped, and now most shippers on the MarketLink pipeline are actually paying a reforced rate in the tariff and not a negotiated rate. One last point I would like to just to reinforce, I don't want to repeat or tread on old ground, but Fairless' theory of this case is that the tariff is amended, and you can pick and choose whichever rate you want. That is not the case. When FERC approved the MarketLink project, they specifically approved it at a recourse rate based on the incremental cost of service of that specific facility, or parties to negotiate an alternative rate. In this case, that's what happened. The parties negotiated an alternative rate that was in effect for a certain amount of time and then has since expired, and so the fault is to the recourse rate that is set forth in the tariff. I'm out of time and happy to entertain any questions that the court has. Nothing here, Judge Rogers? Nothing from me, Judge? I'll be very brief. Four quick points. First, most of what we heard from a friend, Ms. Banta, is about why in the absence of a contractual agreement, a rate, the rate that would apply to the 210 bullying plan to Fairless' facility under the tariff, the absence of contractual agreement is the MarketLink rate. We're not disputing that. I want to be clear about that. I think we've been clear about that, but I want to be totally clear about that. We're not disputing that. The question is, was there a contractual agreement, which I think everyone agrees would trump whatever would otherwise apply under the tariff at the point of the contractual agreement. The next thing I wanted to say about that is, I may have been careless in the way I phrased something earlier when I said that every rate in the tariff is just and reasonable. That's true in the abstract. Ms. Banta's right that it doesn't necessarily mean that every rate in the tariff is just and reasonable as applied to any particular set of facts. But that doesn't matter. What matters is there's no dispute that both rates at issue here, the one we say applies, 6 to 6, and the one they say applies, are just and reasonable as applied to the transportation of gas covered by this contract. In fact, 6 by 6 rate is what applied to the very same transportation of the very same quantity of gas from the very same point to the very same point for a long time with not a hint of a suggestion from FERC that somehow that wasn't just and reasonable. So to be more precise than I was earlier, there's no dispute that the rate we're advocating here under the contract would be just and reasonable. That's why it's particularly galling to us for FERC to have gone out of its way to take this issue out of the state court and decide it itself, because FERC shouldn't care, really, whether one of two equally just and reasonable rates applies to this particular contract under sui generis conditions about contractual negotiations. My friend relied on United Illuminating at the podium, and FERC relied on it in its initial decision, although not through a hearing order. Here, I think it's worth talking for a moment about United Illuminating. That's a case where FERC said, yes, it's kind of a contract issue, but we're going to exercise primary jurisdiction because it's a really technical contract issue. It requires interpreting terms like, quote, transmission congestion costs, unquote, and, quote, reliability must run, unquote. Nothing like that here. There's no technical aspects of this contract. Simply what the parties in 2018 intended, whether they had a meeting of the minds or not. And if so, what was it? There's nothing technical about that, and FERC has no particular insight into that. That's what FERC has recognized in case after case after case involving state law claims. The other thing that's particularly interesting about United Illuminating, why it's especially compelling for FERC to be relying on it as a ground for its decision here, is there, as my friend acknowledged, FERC found that the contract was ambiguous, and it applied New York law, recognizing that there could be such a thing as ambiguity, that there could be a need to take evidence, and it referred the case to an ALJ, and the ALJ granted discovery and held an inventory hearing and ultimately found that the parties had a mind. That's the ALJ's language in paragraph 119 of the initial decision on the issue that was in dispute. And then FERC approved that initial decision by the ALJ. That's what should have occurred here. If FERC really thought that the possibility that, depending on the outcome of the contract issue, that FERC might have to construe the tariff, that that possibility was so important and the construction of the tariff was so important to FERC's regulatory responsibilities that FERC would take this case from the state court, then FERC should have done what it did instead of sweeping under the rug our state law claim. One other point, Your Honor, Judge Childs, you asked whether, I hope I'm getting this right, whether our claim that there was latent ambiguity would lose strength because we paid the market link rate. We never paid the market rate under this contract without immediately and clearly protesting. As soon as Fairless inherited this contract, the very first time that we were billed under it by Transco, we were billed to the market link rate. We said, hold on, what gives? We thought it was the six by six rate and we protested. And we had to pay under protest because that's how it works in the FERC world, but we always protest. And the final point is that a lot of what we heard from my friend Ms. Santa is that Exhibit C says none and therefore this is a simple case. And so I acknowledge the fact that Exhibit C says none means that we might not succeed on our state law claim that there was nonetheless a contractual agreement on a rate. But that isn't a reason to pretend that that claim is not a state law claim. It isn't a reason to pretend that we aren't claiming that there was nonetheless a contractual agreement on a rate. If we succeed on that claim, that's because of the intent of these parties in 2018 under sui generis contract conditions in a way that where the result would be the application of a rate that applied for many years to the same contract in a way that shouldn't, or any FERC shouldn't have any concern about. And if somehow that did have any concern for FERC, then FERC could do what it did in Endeavor and say, well, the initial question is one state law. We don't really have an interest in that. We don't really have expertise in that, but depending on the outcome of that, there could be a tariff interpretation issue that would arise. Don't know where to find us. Come find us at that point if you need to. There's no reason why FERC couldn't have done that here. And at the very least, if it was determined to take this case from the Texas courts, FERC had to put itself in the shoes of the Texas court and give us a fair hearing and to actually adjudicate our Texas law claim, not pretend that it didn't exist. Thank you very much, Your Honors. I appreciate your indulgence of time, both of you. Thank you very much. Thank you very much. That will conclude this hearing and we will take it under advice.
judges: Childs, Silberman, Rogers